KENYON v. HOLBROOK MICROFILMING SERVICE, Inc.

No. 283.

Circuit Court of Appeals, Second Circuit.

June 27, 1946.

Martin M. Kolbrener, of New York City, for appellant.

Reuben Golin and Hahn & Golin, all of New York City, for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff, Kenyon, appeals from a judgment against him in an action to recover salary due under a contract of employment by the defendant, and for damages resulting from its breach. The cause was brought in the state court and removed to the district court for diversity of citizenship; and at the conclusion of the evidence the judge directed a verdict because the plaintiff had failed to make out a cause of action. That is the only point involved. The defendant is a Delaware corporation organized in November, 1942, at the instance of Kathleen Hogan and Fred Lhoyd, the actual incorporators being three dummies, who acted throughout at their direction, and who may be disregarded. Hogan and Lhoyd obtained licenses upon several "microfilm" patents; and some time between November, 1942 and July 12, 1943, they got an option for the purchase of a New York company, engaged in the manufacture of "microfilm" whose business they expected to continue under the new corporation. They met Kenyon in February, 1943, and had several interviews with him in which they persuaded him to become president of the new company. On March 11th, they executed a contract, the substance of which is set forth in the margin;[1] and for two months beginning April 16th, when he definitely gave up his position in another company, he was steadily engaged in various kinds of work for the

[1] "1. It is hereby understood and agreed that you are to be employed as President and General Manager of Holbrook Microfilming Service, Inc., for a period of five (5) years from the date of issuance to you of three and one-half percent (3½%) of the total authorized capital stock of Holbrook Microfilming Service, Inc., and an interest equivalent in kind to three and one-half percent (3½%) of the interests allotted to the undersigned in Micropat, Inc., pursuant to any and all agreements by the undersigned and/or Micropat, Inc., said stock in both of the foregoing companies shall be delivered to Mr. Frank C. Kenyon on the sixteenth day of the thirteenth month following the date of issuance of said stock to him and in his name.

"2. The compensation as President and General Manager of Holbrook Microfilming Service, Inc., shall be Thirty-Six Thousand Dollars ($36,000.00) per annum for the life of this agreement, unless altered by the parties hereto on a basis of mutual agreement and consent, payable in monthly installments of Three Thousand Dollars ($3,000) each. Any expense incurred during Mr. Kenyon's tenure of office by him in the furtherance of the interests of Holbrook Microfilming Service, Inc., shall be borne by said company.

"3. It is hereby understood that this agreement is confined exclusively to Frank C. Kenyon and that the stock hereinbefore mentioned shall be issued to him only and to no other person firm or corporation. It is likewise understood and agreed that said stock shall never be offered for sale or bartered or traded in whole or in part without first submitting it to Fred W. Lhoyd and/or Kathleen Hogan giving them a thirty (30) day notice, in writing, to meet any offer made to Frank C. Kenyon, although it may be assigned to members of your immediate family and/or relatives.

"4. Provision shall be made for tax purposes to issue said stock 24 hours in advance of the culmination of the major financing from the Robinson Foundation,

corporation. Part of this was the preparation of a prospective "budget" for the first year of operations, showing in detail the necessary capital outlay, the "break-even point," a detailed analysis of the expected profits, a summary of profit and loss and concluding with a "Maximum Cash Absorption during first year" of about $135,000. Everybody concerned knew that some financing was necessary: the contract itself disclosed that Hogan and Lhoyd had originally expected to get the money from a financing company—the Robinson Foundation. Two years before, Hogan had interviewed a financier, named Raskob, about her plans, and in April of 1943 she told him that she had made "an arrangement with a Mr. Kenyon" as president of the new company at a salary of $36,000; and Raskob had intimated that he thought that too high a salary for a new industry. She first proposed to him that he guarantee the financing of the Robinson Foundation; but, although he refused this, by the middle of June he had begun to show an active interest in the project. As early as the 12th of May, Hogan told Kenyon that Raskob would not guarantee the Robinson Company, but that he would probably lend a substantial sum; and on the 19th she assured him that Raskob was "going to finance the company." In spite of this, since Kenyon had received up to June 15th only $500 for his work, he had become much discontented at the delay; moreover, on that day the two months had expired which he had set for himself as the limit for financing the corporation. He therefore then told Hogan and Lhoyd that he must know when the company would be financed. They told him that they could not give him any further information except that Raskob was not going to make a loan, but would finance the company directly. Two days later, on the 17th, he made up his mind to wait no longer, and he sent word to Hogan and Lhoyd through one, Peacock, that he would not do so; and on the next day, having again asked them to set a definite date, and having learned from them that this they could not do, he told them that he would "drop out." We shall later discuss the testimony on this point in a little more detail.

On June 16th, Raskob wrote Hogan a letter, a copy of which is contained in the margin.[2] He told her to show this to Kenyon, and to tell him that she had not been able to get the financing done and that there would be no position available in the company for him; but that, if six or eight months later he was still interested in the venture, and if Hogan had been then successful in her financing, he might come back and see her again. She did not show this letter to Kenyon until much later, nor did she tell him what Raskob had said. Kenyon made no suggestion of withdrawing his refusal to proceed further; and on June 25th Governor Smith on behalf of himself and Raskob, formally agreed to finance the company to the extent of $150,-000, in exchange for all the stock and securities, and upon other terms which are not relevant here. Hogan delivered all the stock to Raskob on the 12th of July, and the shareholders elected as directors, Raskob, Smith, and one Tarry. Lhoyd and Hogan were made vice-presidents, but later left the company. When Kenyon learned these facts considerably later, he insisted upon performance of the contract, and brought this suit in February, 1944. Raskob has seen Kenyon's "budget" before June 18th; and arguendo we will assume that a jury might have found that it was in part because of the information it contained that he and Governor Smith agreed to take up the enterprise.

 Kenyon first argues that the contract of March 11, 1943, bound the defendant, regardless of ratification by the com-

---

Inc., in accordance with the commitment issued to the undersigned by the Robinson Foundation, Inc."

[2] "I regret to inform you that we will not be able to join you in your microfilm company. The matter I spoke to you about which might make it possible for us to do so has not materialized in the way we had hoped as a result of which, we would have neither the time nor the funds available for this project.

"I am sending this letter together with the documents you sent to me to your home address, 25 East 86th Street.

"Wishing you every success in this venture and again regretting our inability to go along, I remain"

pany's board of directors: this on the theory that Hogan and Lhoyd were the incorporators, and as such had power to commit the corporation. That is a question of Delaware law and, as we are not referred to any decisions of that state which touch upon the point, we are thrown back upon the statutes. The answer is clear: incorporators as such have no power to appoint a president and fix his salary before a board of directors is appointed. We quote § 8 of the Delaware Corporation Law, Rev.Code 1935, § 2040, in the margin.[3] The phrase, "direction of the affairs" of the corporation, even though it stood alone, could not really be thought to allow the incorporators to start the business at once, even before the stock had been subscribed and the directors elected; but it does not stand alone. The context shows that what is meant is that the incorporators shall have charge of so much as is necessary to start the business going by getting in the money and electing the board. Moreover, it so happens that § 10 of the Delaware Corporation Law, Rev.Code 1935, § 2042, expressly provides that the directors or shareholders are to elect the president. Hence, if the defendant is to be held at all, it can only be on the theory that it ratified the contract made on its behalf by Hogan and Lhoyd. That the board of directors never did formally ratify the contract is undoubted; there was no board until July 12th, and Kenyon had already withdrawn from the business on June 18th. To avoid this embarrassment he argues first, that Raskob and Hogan tricked him into this withdrawal; and second, that Raskob had in fact ratified the contract before June 18th, in particular by making use of the prospective "budget." The second argument implies that Raskob's knowledge of the contract and his conduct thereafter was a ratification, although it took place before the stock was issued, or the directors elected. That question is possibly not wholly free from doubt, even though we assume that Raskob was throughout acting

only for himself and Governor Smith, who became the shareholders. Battelle v. Northwestern C. & C. P. Co., 37 Minn. 89, 33 N.W. 327. However, we will assume for argument that, whatever would have been a ratification by Raskob personally, was a ratification by the corporation.

■ As we have said, the first question is whether Kenyon was tricked into withdrawing on June 18th by Hogan's telling him that Raskob had not agreed to finance the company when in fact he had. In the first place there was no evidence that on June 18th Raskob had definitively agreed to finance the company; but it is plain that, so far as he had gone, Hogan told Kenyon all; indeed she perhaps put it in a more favorable light than the facts warranted. In April and through May she kept assuring him that the outlook was favorable; but that was not enough to suit him. He had been able to screw out of Lhoyd only $500, and he kept insisting that he could not go on without his stipulated salary. Hogan and Lhoyd always replied that the corporation must be organized, the stock issued, the money received, and "that has not been satisfactory to Mr. Raskob." Finally, on June 15th, when he said, as an apparent ultimatum, that he must know "when this company is going to be financed," the answer again was that they were "getting very close to it"; Raskob was "getting around to it, but we cannot give you any information at this time." Raskob is actually "going to finance the company directly," but "when was very indefinite." Certainly no jury would be justified in concluding from this testimony—which was Kenyon's own—that Hogan was holding back the true state of the negotiations between herself and Raskob. When the break finally came on June 18th, Kenyon said that he could wait no longer; he would not go on unless there was a "definite plan * * * when the company will be financed and when it will start." He then asked whether it might not go over till December, and Hogan said no; that it had "gone too far";

---

[3] "Until the directors are elected, the signers of the certificate of incorporation shall have the direction of the affairs and of the organization of the corporation, and may take such steps as are proper to obtain the necessary subscriptions to stock and to perfect the organization of the corporation, including the election of directors."

they could not "wait that long"; they had "to get it financed." This assurance did not content him; it was the uncertainty as to how long he must wait that made him withdraw, and that uncertainty was real. He was not deceived; he had merely become impatient at being put off any longer. Nor is it of the least importance whether Raskob's letter to Hogan of June 15th misrepresented Raskob's attitude towards financing the corporation; for, although Raskob told Hogan to show it to Kenyon, she did not do so; perhaps it was more discouraging than she wanted him to believe. If the jury had found that it did not state the truth as to the negotiations (which is by no means certain, for Raskob and Governor Smith did not commit themselves until nearly two weeks later), it would not therefore have formed any basis for a verdict that Kenyon was tricked into withdrawing. Indeed, the whole notion is patently absurd anyway. Raskob did not need to resort to trickery; he was not in the least bound to accept Kenyon, and could safely have refused to put in his money unless Kenyon was excluded.

Therefore, if there be any basis whatever for the action, it is because Raskob had in fact ratified the contract before June 18th; and even then Kenyon would be completely blocked. Although upon that hypothesis, there would have been a contract with the defendant, Kenyon would have repudiated it on June 18th by a repudiation which he did not withdraw until long after Raskob and Governor Smith had undertaken on June 28th to advance $150,000, and after they had, on July 12th, bought the shares and taken over the company. On what conceivable theory Kenyon could then withdraw his repudiation it is impossible to imagine. Restatement of Contracts § 410. However, we need not have recourse to that doctrine, because there is not a tittle of evidence that Raskob ratified the contract before June 18th. He had at once refused to guarantee the Robinson Foundation's suggested financing; and as soon as he heard of Kenyon's contract he disapproved of that too. Whatever hopes he may have engendered in Hogan and Lhoyd which they in turn retailed to Kenyon, he was careful never to commit himself finally before June 28th; and he certainly never agreed to be bound by Kenyon's contract. Indeed, his letter of June 15th itself showed that he wished to have nothing to do with him. As we understand it, upon this phase of the case Kenyon relies, not upon any express ratification, but upon Raskob's use of the "budget." That, as we have shown, was nothing more than a forecast of the probable financial earnings and needs of the business for the first year; including the necessary capital and the cash outlay which would have to be "absorbed." Kenyon knew that the company needed financing; he knew that Raskob was the financier on whom Hogan and Lhoyd were relying; and it is incredible that, when he prepared the figures, he did not know that Hogan and Lhoyd would, or in any event might, show them to Raskob. If Raskob was to put his money into the enterprise, he surely would wish such information as he could get of its prospects, and these were the only figures which anyone had prepared to give him even an intimation of what he should expect. Surely Kenyon must have meant that he should be free to use them before he made up his mind, and that such a use of them did not compel him to take up the venture. If Kenyon did not know this, he was chargeable with knowledge of so appropriate a use of his work. Whether a use of the "budget" after Raskob had agreed to finance the company, would have been a ratification, if Kenyon had not in the meantime withdrawn, is another matter; but until Raskob had so agreed, the use he made of it had no effect upon his obligations or the defendant's. Moreover, when Kenyon "dropped out," he abandoned whatever he had done—the "budget" included—and Raskob might use it as he chose. Whatever claim Kenyon had against Hogan and Lhoyd, he has none against the defendant; and the appeal is totally without merit.

Judgment affirmed.